# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of: | ) | |
| | ) | |
| 2125 W. Kimberly Ave., Milwaukee Wisconsin | ) | Case No. ___17 M 201___ |
| | ) | |
| | ) | |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

2125 W. Kimberly Ave., Milwaukee, Wisconsin (described further in Attachment A)

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:  21 U.S.C. 841(a)(1) and 846

The application is based on these facts: See attached affidavit.

- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested
  under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Duane Clauer, ATF
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: __Dec. 5, 2017__

_____
*Judge's signature*

City and State: <u>Milwaukee, Wisconsin</u>        Honorable David Jones        , U.S. Magistrate Judge

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Duane Clauer, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for 2125 W. Kimberly Ave, Milwaukee, Wisconsin (described further in Attachment A, "TARGET PREMISES") for evidence of violations of Title 21, United States Code, Sections 841(a)(1) (distribution of a controlled substance) and 846 (conspiracy to distribute a controlled substance), (collectively, "TARGET OFFENSES) more fully described in Attachment B.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), Chicago Field Division, currently assigned to the Fairview Heights Field Office in the Southern District of Illinois, and has been so employed as a Special Agent of the ATF since July of 2013. As such, I investigate violations of federal and state firearm and controlled substance laws, including violations under Title 18, United States Code, Sections 922 and 1512. I have been a law enforcement officer for approximately 9 years. From 2012-2013, I was employed as an agent with the Wisconsin Department of Justice, Division of Criminal Investigation. From 2008-2012, I was employed as a Wisconsin State Trooper, where I was often involved in seizing controlled substances and firearms during highway patrol, and I worked closely with the Milwaukee High Intensity Drug Trafficking Area (HIDTA), a federal, state and local law enforcement task force concentrating law enforcement efforts in areas with high percentages of controlled substance and firearm violations. For the majority of my law enforcement career, I have been assigned to various local, regional and federal task forces like HIDTA. I am familiar with and have used the following methods of investigation: undercover

work, interviews of individuals involved at various levels of drug and firearm trafficking, including defendants, informants, and witnesses, the use of visual surveillance, search and seizure warrants, informants, and pen registers, as well as the utilization and control of confidential sources and undercover agents. I have used various types of electronic surveillance, such as wire intercepts, video and audio recordings and transmitters. I have participated in numerous drug investigations that have resulted in the seizure of methamphetamine, crystal methamphetamine, ecstasy, cocaine, marijuana, heroin, and other controlled substances.

3.     I received training regarding federal firearms and controlled substance laws at the Federal Law Enforcement Training Center and the ATF National Academy.  Prior to that, I received training through the State of Wisconsin to serve as a Wisconsin State Trooper and to serve as an agent with the Wisconsin Department of Justice, Division of Criminal Investigation.

4.     The facts in this affidavit come from my personal observations, training and experience, and information obtained from other agents (case agents), witnesses, cooperating defendants, and confidential informants (CI).  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## **PROBABLE CAUSE**

### **Evidence Showing Ernesto Gonzalez Trafficking Narcotics**

5.     For the reasons set out in this affidavit, there is probable cause to believe that the TARGET OFFENSES have been committed, are being committed, and will continue to be committed by Ernesto Gonzalez, and others known and unknown to the investigators engaged in the trafficking of illegal narcotics with, for, or in connection to Gonzalez.  Additionally, there is

2

probable cause to believe that there will be evidence of Gonzalez's drug trafficking at the **TARGET PREMISES**.

6. Case agents assigned to the ATF Fairview Heights, Illinois Field Office (FHFO), have been investigating the Ramon Nunez Firearms/Drug Trafficking Organization (DTO) based in Fillmore, California. The Nunez DTO has been using semi-tractors to distribute illegal narcotics and firearms between Milwaukee, Wisconsin; Kenly, North Carolina; Nampa, Idaho; Atlanta, Georgia; and Mexico. The investigation has revealed that Ramon Nunez is the leader of the DTO, and Ernesto Gonzalez is the leader of the Milwaukee arm of the DTO.

7. On December 14, 2016, Ramon Arize Nunez, Cesar David Grangel, and Ruben X. Nunez Polanco were indicted through the Southern District of Illinois under case number 16-30136-NJR-01. All three defendants were indicted for Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, Conspiracy to Transfer a Firearm to a Previously Convicted Felon, and Conspiracy to Transfer a Firearm to an Illegal Alien.

8. On January 19, 2017, case agents conducted a proffer with Grangel. Grangel admitted to working for Ramon Nunez in scheduling cover loads for the semi-tractors when drugs were transported to Kenly, North Carolina; Milwaukee, Wisconsin; Atlanta, Georgia; and Chicago, Illinois.

9. Grangel stated there were at least two semi-tractors that were being utilized to transport illegal drugs throughout the United States. Grangel stated one of the semi-tractors was red, and the other semi-tractor, which was registered to Grangel, was white. Grangel stated that red semi's company was VRH Trucking. Grangel stated the driver of the red semi-tractor was Victor Manuel Ruiz who had a Texas, Commercial Driver's License. Grangel stated he knew

3

this information because Grangel had to schedule loads for the semi-tractors to haul. Grangel stated the semi-tractors were often loaded with 20 kilograms of cocaine and sometimes two kilograms of "China White" with 18 kilos of cocaine. High-grade heroin mixed with the powerful synthetic painkiller, fentynal is oftentimes referred to as China White. Grangel believed from March 2016 until at least July of 2016 Victor Ruiz was also transporting crystal methamphetamine to Milwaukee, Wisconsin. Grangel stated the crystal methamphetamine was packaged in a ball-shape so it was easy to distinguish from the cocaine.

10.     Grangel stated the leader of the Milwaukee arm of the DTO was named Ernesto. Grangel stated Ernesto's skin was whiter, and he drove a newer, dark color Cadillac. Grangel stated in August of 2016, Grangel received a suitcase of money from Ernesto, which was transported back to Fillmore, CA to Ramon Nunez. Grangel believed that the Milwaukee drug distribution group recently received a dark blue Jeep Liberty to use to haul drugs for Ramon Nunez. He knew this because Ramon Nunez told Grangel that the Jeep was going to Milwaukee, Wisconsin.

11.     On July 14, 2017, case agents conducted a proffer with Jose Angulo in California. Case agents received information from Cesar Grangel that Jose Angulo constructed trap compartments in vehicles and semi-tractors for Ramon Nunez. Jose Angulo admitted to making trap compartments in semi-tractors and motor vehicles for Ramon Nunez and others. Case agents showed Angulo a photo of a 2008 Jeep Liberty with WI registration plate of 168ZKF that was observed parked at TARGET PREMISES, the residence of Ernesto Gonzalez. Ernesto Gonzalez was further observed driving the Jeep Liberty on multiple occasions. Jose Angulo admitted to building a trap compartment that is used to haul drugs in the rear of the 2008 Jeep Liberty. This Jeep Liberty was sold around August of 2017, and seized by law enforcement in

4

September of 2017 in Madison, Mississippi. Officer Jon Cooley stated the vehicle was stopped on a traffic stop, and the search of the Jeep found a trapped compartment in the rear of the vehicle.

12.    On June 15, 2017, case agents interviewed a confidential informant ("CI-1") in Milwaukee, Wisconsin regarding the red semi-tractor with the name VRH Trucking on it mentioned by Grangel. The CI stated he/she was introduced to Ernesto Gonzalez by Daniel Cerda. CI-1 stated that Daniel Cerda told CI-1 he/she could make money talking to Gonzalez. CI-1 stated that Gonzalez asked CI-1 to put a semi-tractor and trailer in his/her name. CI-1 did this, and stated Gonzalez sent the semi-tractor to California to get a trap compartment installed in it to traffic illegal drugs. CI-1 stated when the semi was back in Milwaukee, Wisconsin Gonzalez showed CI-1 how the trap compartment worked. CI-1 has spent over 13 years in the United States military, and has a Bachelor's degree. CI-1's criminal record reveals no felony or misdemeanor criminal convictions. CI-1's observations and statements have been corroborated by other parts of the investigation. CI-1 provided this information against his/her penal interest. CI-1 agreed to provide this information for consideration on any potential federal charges.

13.    CI-1 stated he/she had his/her nephew, Victor Manuel Ruiz, drive the semi-tractor for Gonzalez. CI-1 stated he/she had Victor Ruiz drive the semi-tractor because Victor Ruiz has hauled drugs before, and has prior drug convictions. CI-1 stated that Victor Ruiz had previously served approximately three years in prison for hauling a large load of marijuana. CI-1 stated that Victor Ruiz took the drug proceeds from Milwaukee, Wisconsin to California, and brought the drugs back in the trap compartment to Milwaukee. CI-1 stated that Gonzalez paid Victor Ruiz $5,000 for each way. CI-1 believes this happened from October 2015 until around June of 2016.

CI-1 stated in June of 2016 the semi-tractor's registration, insurance, and taxes were not paid, and the semi-tractor remained in California still registered in CI-1's name.

14.     CI-1 stated in March of 2015 that he brought the cash back from North Carolina for Ernesto Gonzalez, and took it to the 1538 W. National Avenue. CI-1 recalled Gonzalez adding more cash to the cash from North Carolina and repackaging the cash inside 1538 W. National Avenue. CI-1 believed the cash to be drug proceeds because CI-1 knew that Gonzalez was a cocaine distributor, and the cash was packaged in a way like drug proceeds would be transported. CI-1 stated the cash was in bundles and wrapped in plastic.

15.     CI-1 stated that in March of 2015 he/she was fronted one ounce of cocaine by Gonzalez to sell. CI-1 sold the cocaine and then paid for it with the proceeds. CI-1 stated approximately three weeks later, instead of obtaining cocaine from Gonzalez, he was supposed to obtain it from Edy Matute, who was supplied by Gonzalez. CI-1 stated from July of 2015 until November of 2016 CI-1 was fronted 4.5 ounces of cocaine every three to four weeks by Matute. CI-1 described "fronting" as obtaining cocaine for free, and paying for the cocaine after it was sold. CI-1 referred to 1538 W. National Avenue as the "warehouse".

16.     CI-1 stated in November of 2016, Ernesto Gonzalez told CI-1 that Gonzalez was getting a Jeep to transport the cocaine, and would not utilize the semi-tractors anymore.

17.     CI-1 stated he/she owed Matute $3,000 for fronted cocaine. On July 11, 2017, ATF conducted an Under Cover Operation in which CI-1 paid Matute $300 in government funds provided by ATF toward CI-1's cocaine drug debt. This payment occurred at Matute's place of employment, National Muffler, located at 1614 W. National Ave, Milwaukee, WI. Matute arrived to the meet location in a Jeep Wrangler with a Wisconsin registration plate of AAB9866,

6

which was registered to Edy B. Matute-Matute at 1614 W. National Avenue, Milwaukee, WI. During the meet CI-1 attempted to pay Matute $500, but Matute told CI-1 to keep $200 of the money in case CI-1 needed it since CI-1 was having surgery soon.

18.   On or about July 11, 2017, case agents interviewed a confidential informant (hereinafter CI-2) in Milwaukee, Wisconsin regarding their knowledge of Gonzalez and Matute's drug and firearms trafficking. CI-2 stated he/she has known Gonzalez for approximately 15 or 16 years. CI-2 stated approximately five to six years ago Gonzalez told CI-2 that Gonzalez started trafficking in and selling cocaine. CI-2 recalled Gonzalez offering CI-2 several "low risk" jobs associated with trafficking cocaine like bringing a vehicle back from California that Gonzalez told CI-2 did not contain any drugs. CI-2 stated that he/she was offered the opportunity to pick up cash in North Carolina by Gonzalez, and CI-2 introduced Gonzalez to Mathew Hernandez for that cash pickup, and registering a semi in Mathew Hernandez's name. CI-2 stated that Gonzalez did not want anything in Gonzalez's name that would trace back to Gonzalez.

19.   CI-2 stated he/she was asked to purchase three firearms for Gonzalez. CI-2 stated Gonzalez told CI-2 which type and caliber of firearm to buy because certain calibers of firearms are not allowed in Mexico. CI-2 stated he/she purchased the three firearms for Gonzalez even though CI-2 believed that Gonzalez was sending the firearms to Mexico. CI-2 stated he/she was told by Gonzalez in the fall of 2016 that the three firearms CI-2 purchased for Gonzalez were seized by law enforcement. CI-2 stated this conversation happened in front of Matute in an apartment that Matute was renting at 1630 W. National Ave, Milwaukee, WI. CI-2 stated that Gonzalez wanted CI-2 to make a police report that the firearms were stolen from CI-2. CI-2

7

stated when he/she gave the firearms to Gonzalez the firearms were contained in the factory cases with owner's manuals.

20.     CI-2 recalled that within the last year, Gonzalez asked him to bring an SUV from California to Milwaukee, WI. CI-2 stated that Gonzalez told CI-2 that the SUV had a trap compartment in it, and it would be used to move cocaine throughout Milwaukee.

21.     On July 14, 2017, ATF completed an undercover operation in which CI-2 received $2,000 from Matute for lawyer fees. CI-2 stated he/she met with Ernesto Gonzalez earlier in the day, and Gonzalez told CI-2 that Gonzalez would provide $2,000 for CI-2 to up from Matute to help with lawyer fees. CI-2 stated since Gonzalez found out that ATF tried to interview CI-2, Gonzalez has been having CI-2 go through Matute in order to contact Gonzalez. CI-2 believed this was to insulate Gonzalez from getting into any trouble. CI-2 received the $2,000 from Matute outside National Muffler at 1614 W. National Ave. while Matute was working. Matute told CI-2 that CI-2 should have told the police that someone stole the firearms like Matute and Gonzalez told CI-2 previously.

22.     On or about September 6, 2017, CI-2 notified a case agent that he/she was going to 1538 W. National Avenue to meet with Gonzalez and Matute. On September 7, 2017, CI-2 stated when he/she arrived Gonzalez and Matute were drinking outside 1538 W. National Avenue. CI-2 stated that Gonzalez, Matute, and CI-2 went inside 1538 W. National Avenue. CI-2 stated that Gonzalez told CI-2 that Gonzalez no longer has the North Carolina drug connection. CI-2 stated that Matute told CI-2 that Matute is moving out of 1630 W. National Ave, and into 1538 W. National Avenue because it is cheaper. CI-2 stated that he/she asked Matute if Matute was worried about people breaking into 1538 W. National Avenue, and CI-2

8

stated that Matute replied no, because Matute has an "R-15" (likely an AR-15 type rifle). CI-2 stated Gonzalez's red Ford 150 lightning truck, and a black Chrysler 300 which CI-2 saw Alejandro Gonzalez Mercado (Ernesto Gonzalez's brother) driving previously, were parked inside 1538 W. National Avenue.

23.     On October 1, 2017, CI-2 notified a case agent that he/she was going to 1538 W. National Avenue to meet with Edy Matute and Kelvin Figueroa. CI-2 stated when CI-2 arrived he/she went inside 1538 W. National Avenue, and met with Matute and Figueroa. CI-2 stated that Figueroa was taking photos of Matute holding a pistol. CI-2 stated that Kelvin Figueroa then sent the photo to CI-2. CI-2 stated Matute and Figueroa were drinking together. CI-2 stated that Matute told CI-2 that Matute finished moving into 1538 W. National Avenue, and is staying on the first floor of 1538 W. National Avenue. CI-2 stated that Matute told CI-2 that Edy Matute and Ernesto Gonzalez are now getting their cocaine from Colombians in Chicago. CI-2 stated Matute previously asked CI-2 to make narcotics-related trips back and forth from Chicago for Matute and Gonzalez, and CI-2 never gave Matute an answer. CI-2 stated after Kelvin Figueroa took photos of Matute with the pistol Matute laid the chrome Taurus .45 caliber pistol on the couch cushion. CI-2 provided the following picture of Matute with the firearm to a case agent.

9



24.     On or about November 20, 2017, ATF conducted a controlled meet with CI-2 and Matute, Gonzalez, and Figueroa at 1538 W. National Avenue. CI-2 was wearing an audio/video recording device provided by ATF throughout the meet. CI-2 stated they were sitting in the living room of 1538 W. National Avenue on the couch. CI-2 stated that Matute pulled the chrome pistol that Matute showed CI-2 on October 1, 2017 out of Matute's waistband. CI-2 stated that Matute set the pistol on the couch cushion while talking to CI-2. CI-2 stated that CI-2 picked up the pistol, and Matute said it was a .45 caliber Taurus. A case agent observed CI-2 handling what appeared to be a chrome firearm as CI-2 described while reviewing the video footage. The details of the controlled meet that CI-2 provided were further corroborated by reviewing the audio/video recording of the meet. CI-2 further stated that Gonzalez had two phones on his person during the meet. CI-2 stated that Gonzalez carries one phone for regular

10

calls, and the other phone for drug calls that is a "throw away phone." CI-2 provided the number of 414-559-3035 as the number Gonzalez uses for regular calls.

25.    A case agent reviewed the photos of the controlled meet on November 20, 2017, and found that Matute was sitting in the same area that Matute was sitting on October 1, 2017, when Matute was in possession of the chrome Taurus .45 caliber pistol. A silver/chrome object can further be seen sitting on the couch that Matute is sitting on which further corroborates what CI-2 stated regarding Matute setting the pistol on the couch cushion. The color of the pistol on November 20 is consistent with the color of the pistol on October 1, 2017. This further corroborates the information that CI-2 provided that the firearm on October 1st and November 20th that Matute possessed was the same.

26.    On or about November 21, 2017, CI-2 provided information about 1538 W. National Avenue. CI-2 stated that Matute and Figueroa have bragged to CI-2 recently that Matute and Figueroa were drunk recently and firing firearms from the porch on the east side of 1538 W. National Avenue. CI-2 further stated that Matute has asked CI-2 recently if CI-2 would be interested in driving cash or drugs from Milwaukee, Wisconsin to Chicago, Illinois. CI-2 stated that Matute stated that Matute and Gonzalez recently got a new source of supply of drugs in Chicago, and indicated they were "Colombians". CI-2 stated he/she never answered Matute when Matute asked CI-2 about transporting drugs. CI-2 stated that Matute parks his vehicles inside the 1538 W. National Avenue so it appears that nobody is living in 1538 W. National Avenue. This was further verified by fixed surveillance video in the area of 1538 W. National Avenue.

11

27.     A United States Immigration and Customs Enforcement, Enforcement and Removal Operation verified that Matute is an illegal alien and currently in immigration proceedings.

28.     On December 5, 2017, ATF case agents conducted a federal search warrant at 1538 W. National Avenue, Milwaukee, Wisconsin authorized by the Easter District of Wisconsin under case number 17-M-1399.  Case agents encountered Matute sleeping in a bedroom on the southeast side of 1538 W. National Ave.  Case agents observed a silver Taurus, model PT945, .45 caliber pistol, with serial number NVI76774 lying on the bed next to Edy Matute.  Case agents further located a Bushmaster rifle under the bed that Matute was sleeping on.  No other occupants were encountered inside Matute's residence.  The Taurus pistol recovered from Matute's bedroom looked identical to the firearm that Matute had on October 1, 2017, and November 20, 2017.  In addition to the two firearms, case agents located a white plastic grocery bag in the front vestibule/foyer of Matute's apartment. Inside of the grocery bag were multiple plastic bags and two duct tape lined "Kilo" wrappers, one of which had the number "12" written on it.  Wrappers such as this are consistent with packaging and trafficking large amounts of cocaine.  Through my training and experience I know that a kilogram of cocaine to have a street value of $100,000.  Two "kilo" wrappers would suggest the contents would have an estimated street value of $200,000.  Additionally inside the bag was a white powdery residue. The substance was field tested using a NARC 2 test kit and presumptively tested positive for cocaine.

## INFOPRMATION PERTAINING TO 2125 W. KIMBERLY AVENUE, MILWAUKEE, WI

29.     On November 18, 2016, case agents conducted a consent search at 204 West Santa Barbara Street Unit F, Santa Paula, CA, where case agents received consent to search from

12

Sonia I. Nunez DOB: 09/29/94. Sonia Nunez stated that she was the daughter of Ramon Nunez, and lives at 204 West Santa Barbara Unit F with her father. Case agents found a drug ledger in the bedroom of Ramon Nunez. The drug ledger listed income of approximately 2.4 million dollars as drug proceeds. The drug ledger also frequently showed "Ernesto" as the sender of the money. This information is corroborated by Cesar Grangel who stated that "Ernesto" is the leader of the Milwaukee arm of the DTO. The ledger showed all expenses associated with the distribution of the drugs including, gas, maintenance, insurance, and registration with vehicles utilized to transport drugs. The ledger was kept at Nunez's primary residence. Based on my training and experience, this ledger indicates that the DTO is sophisticated and rigorously tracks expenses and revenue. Accordingly, as the head of the DTO in Milwaukee, Gonzalez likely has a similar ledger at his primary residence, which is TARGET PREMISES.

30. On June 15, 2017, Agents conducted surveillance of TARGET PREMISES. Agents observed a subject departing TARGET PREMISES, and get into a 2008 Blue Jeep Liberty with WI plate 168ZKF. A registration check found that the Jeep Liberty was registered to Noel Mange. A VIN history check found that the Jeep was previously registered to Isidro Monje Penaloza on 08/26/16 until 12/08/16 where it was registered to Noel Monge. A firearm that was seized in the Ramon Nunez investigation from a trap compartment in a semi-tractor was previously purchased by Isidro Monje Penaloza. The registration was changed out of Monje Penaloza's name shortly after (approximately one month) case agents interviewed Monje Penaloza regarding the recovered firearm in Monje Penaloza's name.

31. Pursuant to a federal warrant, case agents placed a GPS tracking device on the above-mentioned 2008 Jeep Liberty with Wisconsin license plate 168 ZKF. Case agents placed

13

the GPS on the Jeep on July 7, 2017 while it was parked at Xperience Fitness. Agents found through reviewing the electronic data related to the tracking warrant that the Jeep Liberty was often parked overnight at the TARGET PREMISES. Furthermore, case agents searched a law enforcement database and it listed TARGET PREMISES as Gonzalez's current address. Gonzalez's parents are listed as the owners of TARGET PREMISES. Case agents have driven by the TARGET PREMISES dozens of times, and surveilled the TARGET PREMISES approximately five times, and have never seen any indication of Gonzalez's parents at the TARGET PREMISES.

32.     As mentioned above, CI-2 stated that Gonzalez carries one phone for regular calls, and the other phone for drug calls that is a "throw away phone." CI-2 provided the number of 414-559-3035 as the number Gonzalez uses for regular calls. Based on my training and experience, narcotics traffickers' keep their phones on their persons (readily available) or in a secure location in their residence. Furthermore, narcotics traffickers are likely to have records related to their cell phones in their residence. Such records may include receipts from specific store locations, which also may include information such as related cell phone numbers, and account numbers. There may also be pre-paid minute cards (which are used to re-load minutes onto "burner" or drug-trafficking related cell phones).

33.     Case agents have not known Gonzalez to have legitimate employment since approximately summer 2016. Since that time, case agents have observed him driving numerous costly vehicles including a leased, newer-model Cadillac, a 2014 Chrysler 300, a 2008 Jeep Liberty, and a 1999 "supped up" Ford Lighting (with chrome rims, an improved engine, and other modifications). Additionally, CI-2 has observed Gonzalez wearing expensive-appearing

14

jewelry such as gold bracelets, gold chains, and expensive-appearing watches. Based on my training experience, it is likely that there will be documents related to the purchase of these items at his primary residence, which is TARGET RESIDENCE, which will provide evidence of the disposition of drug proceeds.

34.     On December 4, 2017, at approximately 7:05 p.m. I saw figures consistent with Gonzalez's description and Matute's description exit a Chrysler 300 and enter 1538 W. National Ave. I continued surveillance for approximately 30 minutes, but did not see either figure exit the building. Case agents surveilled TARGET PREMISES beginning at approixmatley 3:30 a.m. on December 5, 2017, and saw the Chrysler 300 parked the driveway. Later, on the same day, at approximately 11:05 a.m., Agents observed Gonzalez exit the TARGET PREMISES, and get into the black Chrysler 300 with WI registration plate of AAY8820. Agents observed Gonzalez leave the TARGET PREMISES and drive to Xperience Fitness. Case agents observed Gonzalez return to TARGET PREMISES in the Chrysler 300 at 11:48 a.m.

35.     Based on the aforementioned information, there is probable cause to believe that there will be evidence of Ernesto Gonzalez's violations of Title 21, United States Code, Sections 841(a)(1) (distribution of a controlled substance) and 846 (conspiracy to distribute a controlled substance) located at the TARGET PREMISES.

## TRAINING AND EXPERIENCE REGARDING EVIDENCE OF THE TARGET OFFENSES

36.     I have participated in numerous state and federal investigations involving firearms and narcotics possession and trafficking. These investigations have resulted in the seizure of various controlled substances, as well as a wide variety of firearms, firearm accessories and firearm ammunition. I am familiar with and have utilized various methods of investigation, such

15

as audio, video and electronic surveillance, including the use of court-authorized wire intercepts, interviews of individuals involved at various levels and in various roles of drug and firearm possession and trafficking, the application for and execution of search and arrest warrants and various court orders for cellular and land-line telephone information, the use of informants, and the utilization of undercover agents and operations. Based on my training, experience, and interaction with other law enforcement officers, and my knowledge of this investigation and others, I am aware of the following:

        a.        The distribution of drugs is generally a continuing criminal activity taking place indefinitely unless interrupted by law enforcement action. Indeed, based on my training and experience, individuals who have established an income based on narcotics sales tend to continue the activity for prolonged periods of time because that is how they make a living.

        b.        Narcotics traffickers begin trafficking in small quantities of narcotics. As they develop their customer base and their supply contacts, they are able to deal in larger quantities of narcotics. Thus, those who are trafficking in large quantities of narcotics, e.g., individuals found to possess multiple kilograms or pounds of controlled substances and distribute multiple kilograms or pounds of controlled substances across state lines, are not new to the business; rather, they have usually established their contacts and customers over months or years.

        c.        Individuals involved in narcotics trafficking generally sell narcotics for cash. Therefore, narcotics traffickers typically have significant amounts of cash on hand, as proceeds of sales, to purchase their own supplies, or as profits from their narcotics trafficking activities (such as profits from sales or profits from the transportation of narcotics or narcotics proceeds). In addition, narcotics traffickers often have other assets generated by their narcotics business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables. Narcotics traffickers often keep these items, and records reflecting their purchase or sale, such as automobile titles or deeds to property, as well as evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of

16

money acquired from engaging in drug trafficking activities, in their residences, offices, garages, storage buildings, outbuildings, automobiles, and safe deposit boxes.

d.     Narcotics traffickers also often maintain in their residences or vehicles documents relating to their communication devices, in the form of receipts, bills, telephone and address books, and other books and papers which reflect, among other things, the names, addresses, and/or telephone numbers of their customers, co-conspirators, and associates in the drug trafficking organization.

e.     Individuals involved in narcotics trafficking commonly provide narcotics to trusted distributors in their organization on credit and commonly obtain narcotics from their suppliers on credit. Therefore, I am aware that individuals involved in narcotics trafficking maintain books, records, customer lists, receipts, notes, ledgers, and other papers relating to the transportation, receipt, ordering, sales, and distribution of narcotics, narcotics proceeds, and equipment, and that such documents may be in code to attempt to thwart law enforcement detection.

f.     Narcotics traffickers keep records of their illegal activities for a period of time extending beyond the time during which they actually possesses particular controlled substances, in order to maintain contact with criminal associates for future narcotic transactions, and to have records of prior transactions for which, for example, they might still be owed payment, or might owe someone else money.

g.     Narcotics traffickers often require the use of one or more telephones, pagers, or other digital devices to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances. In addition, I know that professional narcotics operations depend upon maintaining timely long-distance and local contacts with the original suppliers and those down the organizational chain to the local traffickers. Telephones and other digital devices enable narcotics traffickers to maintain contact

17

with narcotics associates, narcotics suppliers, and narcotics customers. Narcotics traffickers often use fraudulent information to subscribe to communication facilities, especially cellular telephones, maintain separate customer and supplier telephones, and frequently change communications facilities to thwart law enforcement efforts to intercept their communications. I also know that narcotics traffickers frequently use pre-paid telephones with misleading subscriber information as a way of insulating themselves from criminal liability.

    h.  Data contained on digital devices used by drug traffickers often include, among other things, records of telephone calls, text messages, and e-mail communications between the trafficker and the co-conspirators; Global Positioning System ("GPS") information and other location information that can help identify stash locations, meeting places, and trafficking routes; and identifying information about the trafficker and co-conspirators, such as contact lists, calendar appointments, and photographs or videos.

    i.  I am aware that narcotics traffickers maintain in their residences or vehicles telephone and address books, telephone bills, and other books and papers which reflect, among other things, the names, addresses, and/or telephone numbers of their customers, co-conspirators, and associates in the drug trafficking organization, even if said items are in code. In addition, data, records, documents, materials, programs, or other items contained on cellular telephones used by drug traffickers often contain, among other things, information relating to the purchase, sale, transport, or distribution of drugs, the location of previous drug transactions or stash houses, and/or the identity or whereabouts of traffickers and co-conspirators involved in narcotics trafficking.

18

## ATTACHMENT A

### Property to Be Searched:

2125 W. Kimberly Ave, Milwaukee, Wisconsin, Further described as a blue ranch style
residence with blue shutters and 2125 in black letter to the left of the front door which faces
south toward Kimberly Avenue, and has a white garage door.



19



20

## ATTACHMENT B

## ITEMS TO BE SEIZED

All records relating to violations of 21 U.S.C. §§ 841(a)(1) and 846, including but not limited to:

All bank records, checks, credit card bills, account information, and other financial records;

Financial records, documents, statements, or other evidence of control of bank or other financial accounts and investment funds;

Lists of drug customers and related identifying information;

Types, amounts, and prices of drugs trafficked, as well as dated, places, and amounts of specific transactions;

Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

Indicia of residency;

Safes, vaults, or lock boxes used to store proceeds or records from these crimes;

U.S. Currency or other records related to the disposition of drug proceeds, such as the purchase of jewelry or cars; and

Cellular telephones and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and or video recordings, pictures, settings, and any other user defined settings and/ or data as well as any documents related to the cellular telephones, which may include receipts from specific store locations, which also may include information such as related cell phone numbers, and account numbers. There may also be pre-paid minute cards (which are used to re-load minutes onto "burner" or drug-trafficking related cell phones).

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).